UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

―――――――――――――――――――――

SEEMA SHARMA, JAVED MUGHAL,
SHAIKH HAQ, GUL R. TARIQ,               16-cv-9109
ISHRAT SULTANA KHAN and
INDIRABEN PATEL,

                    *Plaintiffs*,              **COMPLAINT**

          -against-

AIRPORT MANAGEMENT SERVICES, LLC,
d/b/a HUDSON NEWS,
HUDSON NEWS COMPANY,
HUDSON GROUP LLC and
HUDSON GROUP (HG) RETAIL, LLC,

                    *Defendants*.

―――――――――――――――――――――

     Plaintiffs Seema Sharma, Javed Mughal, Shaikh Haq, Gul R. Tariq, Ishrat Sultana Khan and Indiraben Patel, through their undersigned counsel, alleged as follows for their Complaint against Defendants Airport Management Services, LLC d/b/a Hudson News, Hudson News Company, Hudson Group LLC and Hudson Group (HG) Retail, LLC (collectively, "Defendants," "Hudson News" or "the Company"):

## <u>INTRODUCTION</u>

    1.    Plaintiffs are six mostly-older employees of South Asian descent who worked for Hudson News for up to 63 or more hours a week for many years with no overtime pay.

2.      They were given important-sounding job titles, but their main duties consisted of non-managerial tasks, such as working the cash register, collecting and delivering newspapers and magazines, transferring money to the office, cleaning the store, bringing merchandise to and from the warehouse, stocking the shelves, acting as watchmen (security guards), pest control, etc.

3.      Plaintiffs were often praised for their tireless work and devotion.  But Hudson News fired and replaced them, telling them, in substance, that even though they were very good workers, business was too slow.

4.      The excuse Hudson News gave for firing them was false.  Instead, upon information and belief, the Company fired Plaintiffs for three unlawful reasons:

- It viewed them as "too old," and wanted to replace them with younger employees.

- It wanted to increase "diversity" by reducing its very high percentage of South Asian employees, and, at the local level, the District's General Manager was less comfortable working with employees of South Asian descent than he was working with employees from his own background.

- It wanted to pre-empt an overtime lawsuit by firing them under false pretenses (i.e., telling them business was too slow) instead of reclassifying them as hourly employees, which it feared would raise questions and lead to a lawsuit like the one filed by identically-titled employees at a nearby location.

2

5.     For its unlawful age and race discrimination against Plaintiffs, Hudson News is liable under the New York City Human Rights Law, N.Y. City Admin. Code §§ 8-101, *et seq.*, for damages equal to the value of the compensation Plaintiffs would have earned from Hudson News had their employment not been terminated, including, without limitation, compensatory damages, back pay, front pay and the value of lost benefits (past and future), together with punitive damages, attorney's fees, costs, disbursements, prejudgment interest and other appropriate relief.

6.     For its failure to pay Plaintiffs their legally-mandated overtime pay, Hudson News is liable for unpaid overtime, liquidated damages, prejudgment interest (to the extent not duplicative with purely compensatory liquidated damages), attorney's fees, costs, disbursements, and other appropriate relief under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 216(b) and New York Labor Law ("NYLL") articles 19, § 650, *et seq.*, and 6, § 190, *et seq.* and Part 142 of Title 12 of New York's Codes, Rules and Regulations ("N.Y. Comp.Codes R. & Regs.").

7.     For its unlawful discrimination and pre-emptive retaliation against Plaintiffs, i.e., firing them under false pretenses to try and avoid disclosure of its substantial overtime liability and the legal action that would likely follow, Hudson News is liable under 29 U.S.C. § 215 and NYLL § 215 for damages equal to the

value of the compensation Plaintiffs would have earned from Hudson News had their employment not been terminated, including, without limitation, compensatory damages, liquidated damages, back pay, front pay and the value of lost benefits (past and future), together with punitive damages, attorney's fees, costs, disbursements, prejudgment interest and other appropriate relief.

8.      To prevent the unnecessary diminution of Plaintiffs' recovery of unpaid overtime and liquidated damages, this Complaint is being filed after counsel's preliminary review of the facts.  An Amended Complaint will likely be filed after further investigation and review of the facts to make any needed refinements or adjustments to the facts alleged herein, and to the legal claims alleged herein (e.g., adding federal and state equal pay claims, as appropriate).

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction over this matter under 29 U.S.C. § 216 and 621, *et seq.*, and 28 U.S.C. §§ 1331, 1337 and 1343.

10.      This Court has supplemental jurisdiction over Plaintiff's state and local law claims under 28 U.S.C. §1367, as these claims arise from a common nucleus of operative facts.

11.      Venue is proper in this district under 28 U.S.C. § 1391 because, *inter alia*, it is the complained-of acts occurred in this District.

4

## THE PARTIES

12.     Plaintiff Seema Sharma is an individual residing at 88-31 240th St., Bellerose, NY 11426.

13.     Plaintiff Javed Mughal is an individual residing at 10154 103rd St. Ozone Park, NY 11416.

14.     Plaintiff Shaikh Haq is an individual residing at 36 Bunker Lane, Hicksville NY 11801.

15.     Plaintiff Gul R. Tariq is an individual residing at 9 Terrace Court, Piscataway, NJ 08854.

16.     Plaintiff Ishrat Sultana Khan is an individual residing at 66 W. 116th St., Apt. 2b, New York, NY 10026.

17.     Plaintiff Indiraben Patel is an individual residing at 39-38 65 Place, Woodside, NY 11377.

18.     Defendants are owners and operators of news and travel retail shops commonly found in and around airports and train stations across the Country.

19.     Upon information and belief, Defendant Airport Management Services is a Delaware limited liability company.

20.     Defendant Airport Management Services regularly conducts business in Manhattan.

21.     Upon information and belief, Defendant Airport Management Services has its principal place of business at 1 Meadowlands Plaza, Suite 902, East Rutherford, New Jersey 07073.

22.     Upon information and belief, Defendant Hudson News Company is a New Jersey corporation which operates a business in New York County, and has its principal place of business at 1 Meadowlands Plaza, Suite 902, East Rutherford, New Jersey 07073.

23.     Defendant Hudson News Company is a wholly owned subsidiary of Dufry, AG, a Swiss company.

24.     Upon information and belief, Defendant Hudson Group LLC is a New Jersey limited liability company.

25.     Upon information and belief, Defendant Hudson Group LLC operates a business in New York County, and has its principal place of business at 1 Meadowlands Plaza, Suite 902, East Rutherford, New Jersey 07073.

26.     Defendant Hudson Group LLC is a wholly owned subsidiary of Dufry, AG, a Swiss company.

27.     Upon information and belief, Defendant Hudson Group (HG) Retail, LLC is a Delaware limited liability company.

28.     Upon information and belief, Defendant Hudson Group (HG) Retail, LLC operates a business in New York County, and has its principal place of business at 1 Meadowlands Plaza, Suite 902, East Rutherford, New Jersey 07073.

29.     Upon the filing of this Complaint Plaintiffs are contemporaneously providing notice of this Complaint to the New York Attorney General's Office consistent with NYLL § 215.2(b).


## FACTS

**Defendants' status as joint employers**

30.     At all material times herein Defendants frequently used their respective names to denote Plaintiffs' employer(s).

31.     At all material times herein Defendants frequently used the names "Hudson News," "Hudson Group," and similar-sounding names to denote Plaintiffs' employer(s).

32.     At all material times herein Defendants identified the same address as the address of Plaintiffs' employer(s):  1 Meadowlands Plaza, Suite 902, East Rutherford, NJ 07073.

33.     At all material times herein the earnings statements issued to Plaintiffs identified Plaintiffs' employer as Hudson Group (HG) Retail, LLC or as Airport Management Services, LLC d/b/a Hudson News.

34.     At all material times herein the W-2s issued to Plaintiffs identified Plaintiffs' employer as Airport Management Services, LLC.

35.     Defendants have presented Plaintiffs with legal documents identifying Hudson Group (HG) Retail, LLC as Plaintiff's employer, and as having authority to act on behalf of Airport Management Services, LLC.

36.     Upon information and belief, at all material times herein Defendants jointly managed and controlled staffing, payroll, legal compliance advice, and other services, as well as hiring and firing of "Hudson Group" employees and maintaining "Hudson Group" employment records.

37.     Upon information and belief, at all material times herein the named Defendants were the entities through which the terms and conditions of Plaintiffs' employment were established and maintained.

38.     At all material times herein Defendants exercised significant managerial control over Plaintiffs, including, without limitation, delineating work duties, determining compensation, hiring and firing, and maintaining employment and compensation records.

8

39.     At all material times herein, Defendants knew about, directed, controlled, ratified, participated in and benefitted from the wage and hour violations alleged herein.

40.     Defendants are employers and/or joint employers under federal and New York State law, including 29 U.S.C. §203(d), 29 C.F.R. §791.2, and the NYLL.

**Brief Summary of Plaintiffs' General Duties**

41.     Plaintiff Seema Sharma was first employed by Defendants in 1992, and, after periodic breaks in service, resumed her employment with Defendants in 2001.  Defendants terminated Sharma's employment on September 1, 2016.

42.     Plaintiff Javed Mughal was first employed by Defendants in 2003, and, after periodic breaks in service, resumed his employment with Defendants in 2001.  Defendants terminated Mughal's employment on September 1, 2016.

43.     Plaintiff Shaikh Haq was first employed by Defendants in 2008.  After a break in service, he was rehired in 2009 and continued to be employed by Defendants until the Company terminated his employment on September 1, 2016.

44.     Plaintiff Gul R. Tariq was employed by Defendants from 2008 until Defendants terminated her employment on September 1, 2016.

9

45.     Plaintiff Ishrat Sultana Khan was employed by Defendants from 1993 until Defendants terminated her employment on September 1, 2016.

46.     Plaintiff Indiraben Patel was employed by Defendants from 1997 until Defendants terminated her employment on September 1, 2016.

47.     Each of the Plaintiffs worked in the Company's Penn Station district, referred to as district # 18 (hereafter, the "District").

48.     The District includes the 13 stores in Penn Station, two stores at the 33rd Street-Path Station, and three stores at the Javits Center.

49.     Plaintiff Gul R. Tariq also worked at the Company's Grand Central Station district, referred to as district # 22, which includes several stores (hereafter, the "Grand Central District"), and at the Hudson News store in the United Nations.

50.     Plaintiffs were employed by Hudson News as front line workers with a variety of important-sounding "managerial" titles, e.g., "operations manager," "manager," and similar-sounding titles.

51.     All Plaintiffs were sometimes referred to as "operations manager" or "manager."

52.     The only Plaintiff with the title "customer service manager" was Javed Mughal.  However, Javed Mughal worked mostly in the magazine warehouse, and had fewer interactions with customers than the other Plaintiffs.

53.     Gul R. Tariq was also referred to as a "book manager," "inventory control manager" and "operations manager" at different points.

54.     Plaintiffs were also sometimes referred to as "cashier" or "watchman," depending on their function.

55.     Plaintiffs' actual managerial or supervisory duties were de minimis, and constituted less than 5% of Plaintiff's work time.

56.     Over 95% of Plaintiffs' time was spent on front line tasks, e.g., working as cashiers, working as watchmen (security guards), stocking shelves, transporting merchandise to and from the warehouse, pest control, and other front line tasks.

57.     In or about 2010, then-GM Joe Khan told Plaintiff Seema Sharma, in words or substance, "*Don't think you're like a manager here.  My 60 hour a week cashier gets paid more than you.*"

58.     Plaintiffs' jobs involved more bending and lifting than the employees who received an hourly wage.

59.     As a result, the District's General Manager ("GM"), Dan Fordyce, scrapped the dress code for store "managers" in 2016.

60.     Unlike the District's bona fide managers, Plaintiffs used the same pest- and rat-infested lunch room and locker room as the District's other front line workers (e.g., cashiers and watchmen).

61.     The Company improperly classified Plaintiffs as exempt.

62.     The Company made Plaintiffs work a substantial amount of overtime hours without paying them for their overtime hours worked.

**The Company's "Shift Leaders" and Managers**

63.     Plaintiffs were supervised by "operations managers" known as "shift leaders."

64.     Kamlesh Desai was the "a.m." shift leader, and Anna Drammeh (and before her, Iqbal Mohammed) was the "p.m." shift leader.

65.     The shift leaders reported to the District's Assistant General Manager ("AGM") Pavel Hasanat (and before him, Sakawat Khan).

66.     The District's AGM reported to the District's GM (Dan Fordyce, and before him, Edwin Soto, and before him, Joe Khan).

67.     The District's GM reported to the Vice President Operations (currently Edwin Soto, and before him, Terry Lent).

**First cause of action**

**Age discrimination in violation of
the New York City Human Rights Law**

68.     The Complaint's preceding allegations are incorporated by reference.

69.     Seema Sharma was born August 20, 1967.

70.     Javed Mughal was born February 11, 1952.

71.     Shaikh Haq was born March 13, 1957.

72.     Ishrat Sultana Khan was born April 23, 1954.

73.     Indiraben Patel was born June 10, 1954.

74.     On September 1, 2016, each Plaintiff was separately called into the District's main office, where they were each fired during a respective meeting with the Company's Senior VP of Operations (Doug Martino) and two HR representatives, Sadaf Choudry and John Flaim.

75.     During their respective termination meetings, Senior VP of Operations Martino conveyed to each of the Plaintiffs, in substance, that their termination was not due to their performance, and that the terminations were due to lack of business.

76.     Plaintiffs were not given the opportunity to keep their jobs by working in a different role, or for less pay.

77.     The average age of the five older Plaintiffs the Company fired (Sharma, Mughal, Haq, Khan and Patel) was 59.

78.     The Company retained similarly-situated younger "managers" in the District who, unlike Plaintiffs, had disciplinary problems, including Shakhi (who was in his 40s, and had received written and verbal warnings for sleeping on the job and not performing his duties correctly); Irfan (who was in his 40s or early 50s, and had received written and verbal warnings for coming in late in, and having a bad attitude); and Anita (who was in her early 50s, and had received written and verbal warnings for being away from her post and not properly performing her duties).

79.     The Company mistreated the Plaintiffs (except for Gul R. Tariq) in the months leading up to the firings.

80.     In or about late June or early July of 2016, GM Fordyce, who is in his late 20s and is especially influential because his father Roger Fordyce is an owner of the Company, said, in words or substance, during a meeting of certain "managers," "*You people are too old.  That's why I'm bringing supervisors to help you.*"

14

81.    Seema Sharma replied, in words or substance, "*We are not that old. Mr. Terry Lent worked a long time.  Roger Fordyce is still there.*"

82.    GM Fordyce smiled and said, in words or substance, "*My point is not that,*" and changed the topic.

83.    Shortly thereafter, GM Fordyce transferred Seema Sharma to the dirty, unventilated, rat-infested, bathroom-less store at 33rd Street.

84.    The Company's management knew about the terrible conditions at the 33rd Street store because they visited it and, *inter alia*, large quantities of candy and snacks had to be routinely sent back due to very aggressive rats, and because Javed Mughal told GM Fordyce and Vice President Operations Soto that because there was no bathroom the male "managers" had to relieve themselves in empty bottles and shopping bags.

85.    Upon information and belief, GM Fordyce transferred Sharma to the 33rd Street store because:  **(A)** Sharma's objection to being called "*too old*" was not welcome; **(B)** GM Fordyce did not want Sharma speaking at the daily "manager" meetings (i.e., the meetings between actual managers, such as GM Fordyce, and frontline workers with "manager" titles, such as Plaintiffs); and **(C)** "managers" assigned to the 33rd Street location did not attend the daily "manager" meetings, which meant that moving Sharma to the 33rd Street store would reduce her interaction with other "managers."

86.     In or about July 2016, Tanjier, one of the much younger hourly "supervisors" the Company had recently hired to "help" the "too old" Plaintiffs do their jobs, complained that it was too hot in the store where she was working (store # 7 in Penn Station's lower level).

87.     GM Fordyce responded by moving Tanjier to store # 3, the cleaner upper level store where Sharma was working, and moving Sharma to the store where Tanjier had been working (store # 7).

88.     Sharma, who was hard working and more experienced than Tanjier, told shift supervisor Anna Drammeh that she thought the move was unfair.

89.     Thereafter, shift supervisor Drammeh told Sharma that she conveyed Sharma's complaint to GM Fordyce.

90.     One or two days later GM Fordyce moved John and Brittany -- two of the much younger hourly "supervisors" recently hired to "help" the "too old" Plaintiffs do their jobs -- from the lower level stores to the cleaner upper level stores, where they replaced "managers" Indiraben Patel (who is a Plaintiff) and Shaheen Sheikh, both of whom were sent to work in the less clean lower level stores where John and Brittany had been working.

91.     During this period the Company kept 62-yer-old Plaintiff Ishrat Sultana Khan at the dirty, unventilated, rat-infested, bathroom-less store at 33rd Street.

92.     From late-July 2016 through August 2016, shift leader Anna Drammeh and one of her colleagues came to that store on numerous occasions to "help" Khan "close out the register" -- which was part of Khan's job.

93.     In August 2016 shift leader Anna Drammeh told Gul R. Tariq, in words or substance, "*Dan [Fordyce] wants to know if [Khan] makes any mistakes. Dan says she's at the top of the list.  Call me or text me right away.  We're going to take care of her.*"

94.     Shift leader Anna Drammeh was looking for, or to create, any mistakes that might be used to "justify" firing Khan.

95.     On or about August 12, 2016 GM Fordyce presented Khan with a draft separation and release agreement, and told her to sign it because "*you look very sick.*"

96.     Although Khan had previously taken short-term disability due to a complication relating to her arthritis and diabetes, she was not sick and did not look sick.

97.     Upon information and belief, GM Fordyce was stereotyping the 62-year-old Khan and implying that her appearance – i.e., looking older – was a problem.

98.    Khan was so disheartened by the concentrated efforts to push her out, that she signed the separation agreement and release, but then rescinded it the next day because she could not afford to give up her job.

99.    Khan continued in her job, but knew her days were numbered.

100.    The Company also used unfair and discriminatory tactics against Indiraben Patel before firing her.

101.    In or about October 2015, GM Fordyce told Patel, who had an excellent work record, and was then 61 years old, that she was being fired because a money bag was misplaced.

102.    During that same period, GM Fordyce also fired an approximately-70-year-old employee of South Asian descent named Monsoor for making a mistake a second time.

103.    But Patel's then-lawyer challenged the firing as being discriminatory, and Monsoor also hired a lawyer to challenge his firing.

104.    Both terminations were rescinded shortly thereafter.

105.    The following year, Patel, then 62, was included in the September 1, 2016 firings and was replaced by a much younger employee named John who was in his early 30s, giving rise to an inference of discrimination.  *Woodman v.*

*WWOR-TV, Inc.*, 411 F.3d 69, 76 (2d Cir. 2005) (that "plaintiff was replaced by someone 'substantially younger' gives rise to an inference of discrimination").

106.   Upon learning that her job was being taken from her, Patel told Senior VP of Operations Martino, in words or substance, "*Reduce my salary and hours and make me supervisor.  I have children in college I need to help pay for.*"

107.   The request was denied.

108.   Patel's much younger replacement, John, was much slower and less attentive than Patel.

109.   Ishrat Sultana Khan, then 62, was replaced by an employee in her early-to-mid 30s named Tanjier, giving rise to an inference of discrimination. *Woodman*, *supra*.

110.   Khan's replacement, Tanjier, was less efficient and far less experienced than Khan.

111.   During her termination meeting, Seema Sharma, speaking for herself and the other Plaintiffs, said to Senior VP of Operations Martino, in words or substance, "*You're hiring supervisors for $14 per hour, and making overtime. Can't you make us supervisors, and have us work less hours?  We are here.  If the Company is going down, we can help.*"

19

112. The request was denied.

113. Sharma, who was 49, was replaced by an employee named Brittany, who was in her mid-to-late 20s (Brittany), giving rise to an inference of discrimination. *Woodman*, *supra*.

114. Sharma's much younger replacement (Brittany) was less efficient and far less experienced than Sharma.

115. Javed Mughal, who was 64, was incrementally displaced from his warehouse job by an employee believed to be in his mid-to-late 30s named Amouri, thereby giving rise to an inference of discrimination. *Woodman*, *supra*.

116. Mughal's warehouse replacement, Amouri, was less efficient and far less experienced than Mughal and knew very little English, which impaired his ability to communicate with Defendants' non-Spanish speaking employees.

117. Shaikh Haq, who was 59, was replaced by an employee in her early or mid-30s named Shala, thereby giving rise to an inference of discrimination. *Woodman*, *supra*.

118. Haq's much younger replacement, Shala, was less efficient and far less experienced than Haq, and ended up being replaced by another, more experienced employee.

119.   Gul R. Tariq, the only Plaintiff under 40, was included as the token young person in the September 1, 2016 firings.

120.   Unlike the other Plaintiffs, all of whom were much older than Tariq, the Company did not apply negative age-based stereotypes to Tariq, e.g., it did not tell her the work was getting to be too much for her, or that she needed a supervisor to help her do her work, or that she looked sick.

121.   Instead, the Company, speaking through District GM Fordyce and District AGM Hasanat, repeatedly told Tariq, who was much younger and much younger looking than the other Plaintiffs, that she was "fast," "smart," and "flexible."

122.   Moreover, the Company gave Tariq some increased responsibilities in the 6-8-week period leading up to her termination, assigning her to work with a broader range of stores and a wider mix of merchandise.

123.   Nonetheless, the Company included Tariq in the September 1, 2016 firings.

124.   Tariq was willing to take a pay cut to keep her job, and asked Senior VP of Operations Martino if she could work as a "supervisor" instead of being terminated.

125.   Martino denied the request, and told Tariq that the Company selects people at "random" to be let go.

126.   That excuse was false.

127.   Tariq was replaced by an hourly "supervisor" named Pushpa Gomez, whose attendance, punctuality, English, and customer service were not nearly as good as Tariq's.

128.   In light of these facts, the only logical inference is that the Company was trying to obscure its discriminatory motives by including a much younger person (Tariq) in the group of "managers" being fired.

129.   The Company's decision to include Tariq in the firings was unlawful because it was tainted by unlawful discrimination.  *See Redford v. KTBS, LLC*, 135 F.Supp.3d 549, 561 (W.D.La. 2015) (denying summary judgment in case by white male who alleged that he "was fired on the same day [as a black woman] for allegedly the same reason so that she would be forestalled from ever claiming that she was fired due to her race or sex."), *reconsideration granted in part on other grounds*, 2016 WL 552960, at *1 (W.D.La. 2016).

130.   The Company has, and has had at all material times herein, at least four persons in its employ.

131.   The Company is and was at all material times herein:  **(A)** a "person" under NYCHRL § 8-102(5); **(B)** an "employer" under NYCHRL § 8-102(1); and **(C)** a "covered entity" under NYCHRL § 8-102(17).

132.   The NYCHRL states, in pertinent part:

> It shall be an unlawful discriminatory practice:  (a) For an employer or an employee or agent thereof, because of the actual or perceived race, creed, color, national origin, gender, disability, marital status, partnership status, caregiver status, sexual orientation or alienage or citizenship status of any person, to refuse to hire or employ or to bar or to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment.

N.Y.C. Admin. Code § 8–107(1)(a).

133.   "[U]nder the NYCHRL, there are not separate standards for 'discrimination' and 'harassment' claims." *Johnson v. Strive E. Harlem Employment Grp.*, 990 F. Supp. 2d 435, 445 (S.D.N.Y. 2014) (citation omitted). Instead, "there is only the provision of the law that proscribes imposing different terms, conditions and privileges of employment based" on a protected characteristic. *Id.* (citation omitted).

134.   "To establish a . . . discrimination claim under the NYCHRL, the plaintiff need only demonstrate 'by a preponderance of the evidence that she has been treated less well than other employees because of her [protected characteristic].'" *E.E.O.C. v. Bloomberg L.P.*, 967 F.Supp.2d 816, 837 (S.D.N.Y.

2013), quoting *Williams v. N.Y.C. Hous. Auth.*, 61 A.D.3d 62, 78, 872 N.Y.S.2d 27

(1st Dep't 2009).

135.   The Court of Appeals for the Second Circuit has explained:

> New York State courts have noted that, under the Local Civil
> Rights Restoration Act of 2005, Local Law No. 85 of the City
> of New York, analysis of NYCHRL provisions must be
> targeted to understanding and fulfilling what the statute
> characterizes as the City HRL's uniquely broad and remedial
> purposes, which go beyond those of counterpart State or federal
> civil rights laws. In short, the text and legislative history
> represent a desire that the City HRL meld the broadest vision of
> social justice with the strongest law enforcement deterrent.

*Spiegel v. Schulmann,* 604 F.3d 72, 83 (2d Cir.2010) (internal quotation marks and

citations omitted).

136.   Defendants have engaged in age discrimination against Plaintiffs as

aforesaid and have injured them as a result, thereby violating Section 8-107(1)(a)

of the Administrative Code of the City of New York (NYCHRL § 8-107(a)).

137.   Section 8-107(13) of the Administrative Code of the City of New

York (NYCHRL § 8-107(13)) (entitled "Employer liability for discriminatory

conduct by employee, agent or independent contractor") provides, in pertinent part:

**(b)** An employer shall be liable for an unlawful discriminatory practice
based upon the conduct of an employee or agent which is in violation of
subdivision one or two of this section only where:

24

(1) The employee or agent exercised managerial or supervisory responsibility; or

(2) The employer knew of the employee's or agent's discriminatory conduct, and acquiesced in such conduct or failed to take immediate and appropriate corrective action; an employer shall be deemed to have knowledge of an employee's or agent's discriminatory conduct where that conduct was known by another employee or agent who exercised managerial or supervisory responsibility; or

(3) The employer should have known of the employee's or agent's discriminatory conduct and failed to exercise reasonable diligence to prevent such discriminatory conduct.

138.   That provision was violated by the conduct of the above-referenced managers and officials of the Company, and any other managers or officials involved in mistreating or firing Plaintiffs, because they exercised managerial or supervisory responsibility.  Defendants knew, or are chargeable with knowledge of, their discriminatory conduct, and acquiesced in such conduct or failed to take immediate and appropriate corrective action, and failed to exercise reasonable diligence to prevent it.

139.   As a result of the foregoing, Plaintiffs are entitled to recover from Defendant an amount equal to the value of all compensation they would have earned had their employment not been interfered with, including, without limitation, back pay and front pay, the loss of the value of future benefits, and

compensatory damages for the stress and mental suffering caused by Defendants' conduct, together with attorney's fees, costs, disbursements and prejudgment interest -- all in amounts to be determined at trial.

140.   Additionally, considering the reprehensible nature of Defendant's conduct and the compelling public interest in deterring illegal discrimination, substantial punitive damages should be imposed against Defendants in an amount to be determined at trial.

### Second cause of action

### Race and national origin discrimination
### in violation of the New York City Human Rights Law

141.   The Complaint's preceding allegations are incorporated by reference.

142.   Each Plaintiff is an immigrant of Asian descent, and South Asian descent in particular (consisting of persons from Pakistan and India).

143.   Haq, Mughal, Khan and Tariq are from Pakistan.  Sharma and Patel are from India.

144.   Immigrants of South Asian descent such as Plaintiffs often gravitate to the retail service industry, especially those sectors of the retail service industry where they feel they can succeed through hard work.

145.   For most of its existence, Hudson News was comprised mainly of employees of South Asian descent.

146.   Over the years, Hudson News grew and prospered largely through the hard work of the South Asian immigrants it employed, going from a small number of Hudson News stores in the late 1980s to over 700 Hudson News stores today.

147.   Consistent with Shaikh Haq's explanation that "*we are the basement people. We do what we are told to get the job done without complaining*," the Company stereotyped immigrant employees of South Asian descent as a hardworking, uncomplaining people who did not need or deserve to receive all of the required health, safety and legal protections.

148.   Accordingly, the Company was more willing to select immigrant employees of South Asian descent to work in certain locations where employees of other backgrounds often refused to work, such as the Company's dirty, unventilated, rat-infested, bathroom-less store at 33rd Street.

149.   In or about September 2013 Cathy Fisher, who is not of Asian descent, became the District's GM.

150.   In or about September 2013, Fisher, referring to her South Asian predecessor, Joe Khan, told Plaintiffs Seema Sharma and Javed Mughal, in words or substance, "*Joe Khan's family's got to go.*"

151.    Fisher's "*family*" reference was to the employees or "managers" of South Asian descent under Joe Khan, and was logically understood by Seema Sharma and Javed Mughal as a warning that they would eventually be pushed out of the Company.

152.    In or about November 2013 Edwin Soto, who is not of Asian descent, replaced Fisher as District GM.

153.    Soto worked in that capacity until he became the Company's Regional Vice President for the New York metro area in or about September 2015.

154.    Soto regularly spoke with Hispanic employees in Spanish, even in the presence of customers, both before and after becoming Regional VP.

155.    However, Soto prohibited South Asian employees (including Plaintiffs) from speaking in their native language regardless of whether customers were present.

156.    Other management-level employees of Defendants also prohibited South Asian employees (which included Plaintiffs) from speaking in their native language while on Defendants' premises, including Terry Lent (Defendants' Vice President, Operations) and GM Fordyce.

157.    In other ways Soto also generally treated South Asian employees less well than other employees, especially Hispanic employees, whom he favored.

158.   In early 2014 Soto hired four Hispanic employees with very poor English, including his Spanish-speaking barber, to work in the Company's magazine warehouse located in Penn Station.

159.   One of those new hires, Amouri, was promptly made co-equal with Plaintiff Javed Mughal even though Amouri's English was very bad and he did not know how to do the job.

160.   After Amouri was made co-equal with him, Mughal, who was not favored by Soto, was required to do much more of the "heavy lifting" than Amouri, such as bundling magazines, dividing stacks of magazines, using hydraulic jacks to move magazine-filled pallets filled with magazines, and other manual tasks.

161.   Soto actively groomed Amouri to replace Mughal, and openly displayed favoritism towards him, even though he and Mughal were ostensibly equal.

162.   Soto spoke extensively with Amouri in Spanish, both inside and outside of the warehouse, and regularly took Amouri to visit stores while Mughal was left behind in the warehouse.

163.   Upon information and belief, consistent with Soto's practice of generally treating employees of South Asian descent less well than other

employees, the Company, beginning in or about 2013, began dramatically reducing employment opportunities for persons of South Asian descent.

164. Upon information and belief, this change occurred because the Company viewed its very high percentage of employees of South Asian descent as an impediment to full "diversity," and because of changes in management caused persons of South Asian descent to be disfavored relative those of different backgrounds.

165. These management changes included, but were not limited to, hiring Edwin Soto as the District's GM and as Regional VP; taking away the hiring role performed by Nassir Mahmoud, a prominent HR manager of South Asian descent who had been actively involved in the Company's hiring process, and reassigning that role to non-Asian managers; and the 2015 hiring of Dan Fordyce as the District's GM.

166. Four of the six Plaintiffs (Sharma, Khan, Mughal and Patel) were replaced by employees who were not of South Asian descent, in part because the Company disfavored employees of South Asian descent relative to other existing and prospective employees.

167. Upon information and belief, because of its efforts to reduce the concentration of employees of Asian descent (and South Asian descent in particular), the Company, starting in or about 2013, began hiring a much lower

percentage of employees of South Asian descent than it had before then, and,
beginning in or about 2015, began firing a much higher percentage of employees
of South Asian descent than it had before then.

168.    Thus, the percentage of employees of Asian (and, in particular, South
Asian) descent declined precipitously over the past three to four years.

169.    Upon information and belief, the percentage of employees of South
Asian descent plummeted from 75% or more down to about 50%.

170.    Accordingly, for treating Plaintiffs less well than other employees and
firing them in part because of their race (Asian, and South Asian in particular),
Defendant is liable under the NYCHRL for all damages caused, including, without
limitation, back pay and front pay, and compensatory damages for the stress and
mental suffering Defendant has caused, all in amounts to be determined at trial.

171.    Additionally, considering the reprehensible nature of Defendant's
conduct and the compelling public interest in deterring illegal discrimination,
substantial punitive damages should be imposed against Defendants in an amount
to be determined at trial.

**Third cause of action**

**Pre-emptive Retaliation in violation of
the Fair Labor Standards Act**

172.   The Complaint's preceding allegations are incorporated by reference.

173.   The Company has been previously sued for unpaid overtime by workers who had been given a "manager" title, including *Ahmad v. Hudson News Co.*, 00-cv-8963 (S.D.N.Y.), *Busgith v. Hudson News Co.*, 2008 WL 1771788 (Sup. Ct. N.Y. Co.) (denying summary judgment); *Khan v. Airport Mgmt. Servs.*, 10-cv-7735 (S.D.N.Y.); *Velasquez v. The Hudson Group, LLC*, 10-cv-4833 (S.D.N.Y.); and *Nabi, et ano. v. Hudson News Company*, 14-cv-4635 (S.D.N.Y.).

174.   Upon information and belief, all but the last of these lawsuits (*Nabi*) were discretely resolved without widespread attention.

175.   With the *Nabi* case pending (a putative class action on behalf of misclassified "managers" working at Hudson News stores in Grand Central), the Company became concerned about its potential overtime liability to its front-line employees misclassified as "managers," such as Plaintiffs.  But it couldn't change Plaintiffs to hourly supervisor status without Plaintiffs questioning why they hadn't been receiving overtime up to that point.  So, it hired and trained lesser-qualified hourly employees to fill Plaintiffs' positions, and then terminated Plaintiffs' employment based on a pretextual excuse that the Company did not have enough business.

176.   Before doing so, the Company began offering "voluntary" termination packages to certain of the misclassified managers who, after accepting the package, would be replaced by hourly "supervisors" performing the same tasks.

177.   Thereafter, in or about late 2015, Regional VP Soto called Seema Sharma to the Company's main office in Penn Station, and asked her to speak to a lawyer for the Company named "Anthony."

178.   Upon information and belief, that was the second time the Company called Sharma to the office to answer questions about a former Penn Station "manager" named Rifat Rizvi, a plaintiff in the *Nabi* case.

179.   Sharma went to the office, and GM Dan Fordyce was there.

180.   The person representing himself to be the Company's lawyer ("Anthony") was on the phone, and questioned Sharma while GM Fordyce was sitting a few feet from Sharma.

181.   The Company's lawyer then began asking Sharma a series of questions about the work she and other "managers" did.

182.   Sharma did not respond to some of the questions the Company's lawyer asked because GM Fordyce interjected the "correct" answer before Sharma could speak.

183.   Defendants then prepared a draft "Declaration of Seema Sharma" with a line at the bottom for Sharma's signature, and presented it to Sharma.

184.   When Sharma looked at the draft Declaration, she saw that her words had been twisted, and that it did not accurately convey her duties.

185.   Sharma felt she would face adverse consequences if she did not sign the Declaration, so she may have signed it.

186.   Defendants warned Sharma not to discuss the matter with anyone else.

187.   The Company's concern about overtime liability to Plaintiffs was underscored by the *Nabi* case, by its preparation of a slanted Declaration, and by its receipt of an October 7, 2015 letter from a lawyer for Plaintiff Indiraben Patel accusing the Company of failing to pay overtime monies owed to Patel.

188.   In or about late June and July 2016, the Company hired several hourly workers in the District with the title "supervisor"

189.   These "supervisors" were taught how to do Plaintiffs' jobs.

190.   Upon information and belief, the Company's existing concern about its potential overtime liability to Plaintiffs was heightened on or shortly after August 17, 2016, when the *Nabi* Court granted collective action certification for a class of employees at Grand Central (less than ⅓ of a mile from where Plaintiffs worked) with the same title used to describe the Plaintiffs in this case ("operations manager").

191.   After that, doing nothing was not a viable option for Defendants because Plaintiffs worked less than ⅓ of a mile from where the *Nabi* Plaintiffs

worked and could be expected to learn (as Sharma had already learned) that their counterparts in Grand Central had an ongoing lawsuit to recover unpaid overtime.

192.   Accordingly, upon information and belief, the Company wanted to reduce the extent of its potential wage and hour liability to Plaintiffs in a way that did not alert Plaintiffs of that liability, as most employers in that position would.

193.   Upon information and belief, Hudson News understood, as most employers in that position would, that changing Plaintiffs to an hourly pay model would have made them highly suspicious, thereby causing them to ask questions, and, in turn, find out that they should have been receiving overtime all along.

194.   Thus, the Company, upon information and belief, decided Plaintiffs would not only have to be let go, but let go in a way that bore some resemblance to a bona fide corporate reorganization, so that the Plaintiffs would not be suspicious.

195.   To that end, the Company offered Plaintiffs severance pay and a "Release Agreement" similar to what other companies sometimes offer when a segment of its workforce becomes unemployed due to a traditional corporate restructuring.

196.   Upon information and belief, the prospect of Plaintiffs seeking redress for unpaid overtime due under the FLSA and the NYLL and its implementing regulations was among the "but for" causes of Defendants' decision to terminate them. *Philip v. Gtech Corp.*, 2016 WL 3959729, at *19 (S.D.N.Y. 2016) ("An

event as significant as an employee's termination can certainly have multiple but-for causes."). *See also Armstrong v. Metropolitan Transp. Authority*, 2015 WL 992737, at *2 (S.D.N.Y. 2015) ("because 'one type of hostility can exacerbate the effect of another,' allegations of race-based, sex-based, and retaliation-based animosity can be considered by a factfinder when evaluating Plaintiffs' claims of race- and sex-based hostile work environment."), citing *Feingold v. New York,* 366 F.3d 138, 151 (2d Cir.2004); *Sogg v. American Airlines, Inc.*, 193 A.D.2d 153, 161 (1 Dep't 1993) (proper focus was on "combined factors of her sex, age, and disability").

197.    Where, as here, the prospect of a complaint motivates the employer to engage in a preemptive retaliatory discharge, the employer's conduct constitutes actionable retaliation. *See*, *e.g.*, *Rodriguez v. C & S Wholesale Grocers, Inc.*, 108 A.D.3d 848, 850, n.2 (3d Dept. 2013) (construing anti-retaliation provision of Workers' Compensation Law § 120 to bar employer from firing employees whose safety infractions caused an injury, as that policy might dissuade some employees from seeking medical attention); *Redford v. KTBS, LLC*, 135 F.Supp.3d 549, 561 (W.D.La. 2015) (denying summary judgment where white male plaintiff claimed he was fired the same day as African-American female employee "so that she would be forestalled from ever claiming that she was fired due to her race or sex."), *reconsideration granted in part on other grounds*, 2016 WL 552960, at *1

(W.D.La. 2016); *Adams v. Persona, Inc.*, 124 F.Supp.3d 973, 982, n.3 (D.S.D. 2015) ("accepting [defendant's] position that [plaintiff] failed to adequately request accommodation would be to condone a type of 'anticipatory retaliation.' [citations omitted] *** [A]n employer would be equally prohibited from anticipating an employee's request for an accommodation by preemptively suggesting its own, thereby commandeering the employee's protected activity, and then terminating employment."); *Sauers v. Salt Lake County*, 1 F.3d 1122, 1128 (10th Cir. 1993) (construing Title VII's anti-retaliation provision: "Action taken against an individual in anticipation of that person engaging in protected opposition to discrimination is no less retaliatory than action taken after the fact[.]").

198.   To hold otherwise would create a perverse incentive for employers to pre-emptively fire employees they fear will complain.  The Legislature could not have intended such an absurd result.  *See Robinson v. Shell Oil Co.*, 519 U.S. 337, 346 (1997) (construing Title VII's anti-retaliation provision expansively to prevent a "a perverse incentive for employers to fire employees who might bring Title VII claims.").

199.   The FLSA's anti-retaliation provision is as broad in scope as Title VII's, *Darveau v. Detecon*, Inc., 515 F.3d 334, 342 (4th Cir. 2008).

200.   If such "hair-trigger" pre-emptive retaliation is condoned, then other employees subject to wage and hour violations may be afraid to associate or

communicate with employees who have pursued or inquired about their wage and hour rights.

201.   Such concerns are particularly acute where, as here, the employees in question are comprised of immigrants from cultural backgrounds where the rule of law is weaker than in the United States, and where suspicion and fear of those occupying positions of authority is generally greater than it is for those born and raised in the United States.

202.   Because of their pre-emptively retaliatory conduct, Defendants are liable for all appropriate damages, including, *inter alia*, lost wages and benefits, non-pecuniary damages, and punitive damages.  *See Sines v. Service Corp. Intern.*, 2006 WL 3247663, at *3 (S.D.N.Y. 2006).

### Fourth cause of action

### Pre-emptive Retaliation in violation of the New York Labor Law

203.   The Complaint's preceding allegations are incorporated by reference.

204.   The NYLL's anti-retaliation provision (NYLL § 215) is even broader than the FLSA's anti-retaliation provision.  *Thompson v. Jennings and Hartwell Fuel Oil Corp.*, 2015 WL 5437492, at *4 (E.D.N.Y. 2015).

205.   Thus, Plaintiffs have *at least as much* protection against being pre-emptively fired to reduce Hudson News's exposure to wage and hour liability than a plaintiff who challenges pre-emptive retaliation under the anti-retaliation provisions of Title VII or the FLSA.

206.   Because of their pre-emptively retaliatory conduct, Defendants are liable for all appropriate damages, including, *inter alia*, lost wages and benefits, liquidated damages, non-pecuniary damages, and punitive damages.  *Sines*, *supra*.

### Fifth cause of action

### Unpaid overtime in violation of the Fair Labor Standards Act

207.   The Complaint's preceding allegations are incorporated by reference.

### Defendants constitute an "enterprise"

208.   Upon information and belief, Defendants constitute an "enterprise" as that term is defined by 29 U.S.C. § 203(r), in that, at all material times herein, they engaged in related activities performed through unified operation and/or common control for a common business purpose.

209.   At all times mentioned herein, Defendants' employees (including Plaintiffs) regularly engaged in interstate commerce in connection with their employment, including, but not limited to:  (a) facilitating the regular

transportation of magazines, newspapers, books, candy, soda, snacks, etc.; (b) handling of goods transported from out-of-state, which are then sold in interstate commerce, across state lines, including, without limitation, magazines, newspapers, books, candy, soda, snacks, etc.; (c) interstate purchases, sales and marketing of goods and materials used in connection with the operation of a nationwide network of related news and travel retail shops; (d) handling transactions that involve the interstate banking, finance and insurance systems; and (e) transacting business across state lines via interstate telephone calls, emails, faxes, courier deliveries, and the U.S. Mail.

210.   At all times mentioned herein, Defendants employed employees in and about their business premises in handling, selling, or otherwise working on goods and materials, including, but not limited to, goods and materials referenced above, and other materials which had moved in or been produced for commerce by other persons.

211.   At all times mentioned herein the annual dollar volume of business of Defendants (referred to herein variously as "Defendants," "the Company," and "Hudson News") was more than $500,000, and Defendants had at least two employees engaged in commerce.

**Defendants' failure to pay Plaintiffs' overtime**

212.   At all times mentioned herein, Defendants failed to comply with the FLSA, in that Defendants frequently required and permitted Plaintiffs to work more than 40 hours per week, but provision was not made by Defendants to pay Plaintiffs at the rate of one and one-half times the regular rate for the hours worked in excess of the hours provided for in the FLSA (29 U.S.C. § 207).

213.   Defendants never paid Plaintiffs one and one-half times their regular rates of pay, or anything at all, for their overtime hours.

214.   There was never any agreement between Plaintiffs and Defendants to compensate Plaintiffs for overtime work.

215.   Defendants are and were at all material times herein aware that Plaintiffs often worked more than 40 hours per week without receiving overtime compensation for any of that additional work.

216.   Each Plaintiff usually worked at least as many hours as were scheduled, except in cases of illness, etc.

217.   All Plaintiffs generally worked six days a week until about March of 2014, when they began working five days a week.

218.   In November 2010 (and before then) Sharma worked from 5:30 am to 4:00.

219.    In or about the spring of 2012, Sharma's scheduled hours changed to 4:30 am to 3:00 pm.

220.    In or about March 2014, Sharma's scheduled hours changed from 1:30 pm to 12 am.

221.    In July 2016, Sharma's scheduled hours changed to 2:00 pm to 1 am.

222.    In November 2010 (and before then) Mughal's scheduled hours were generally from 4:30 am to 4:00 four days a week, and from 5:30 am to 4:00 pm two days a week.

223.    In or about March 2014, Mughal's scheduled hours changed to 4:30 am to 4:00 three days a week, and from 5:30 am to 4:00 pm two days a week.

224.    Beginning in May 2016, Mughal's scheduled hours were 5:30 am to 4:00 pm.

225.    From November 2010 (and before then) through the date of her termination Patel's scheduled hours were 2:00 pm to 1:00 am.

226.    From November 2010 (and before then) through the date of her termination Khan's scheduled hours were 1:30 pm to 12:30 am.

227.    In November 2010 (and before then) Tariq's scheduled hours were generally from 5:30 am to 3:30.

228.    Beginning in or about April 2015, Tariq's scheduled hours changed to 9:00 am to 6:00 pm.

229.   Beginning on August 3, 2015, Tariq's scheduled hours changed to 5:30 am to 4:00 pm.

230.   From November 2010 (and before then) through the date of his termination Haq's scheduled hours were generally from 5:30 am to 4:00.

231.   Defendants are and were at all relevant times herein aware that overtime pay is mandatory for non-exempt employees such as Plaintiffs who work more than 40 hours per week.

232.   "Absent an agreement that the contracting parties understand the weekly salary to include overtime hours at the premium rate, courts have found that a weekly salary covers only the first 40 hours." *Said v. SBS Electronics, Inc.*, 2010 WL 1265186, at *7 (E.D.N.Y. Feb. 24, 2010), *adopted in relevant part*, 2010 WL 1287080 (E.D.N.Y. Mar. 31, 2010); *Giles v. City of New York*, 41 F.Supp.2d 308, 317 (S.D.N.Y. 1999) (same); *Berrios v. Nicholas Zito Racing Stable, Inc.*, *supra*, 849 F. Supp. 2d 372, 387 (E.D.N.Y. 2012); *Guallpa v. N.Y. Pro Signs Inc.*, 2014 WL 2200393, *3 (S.D.N.Y. May 27, 2014) ("Guallpa concedes that he entered into an agreement with his employer that these [weekly] wages would cover a sixty-hour work week for the period from May 2006 to February 2009, and a fifty-four-hour work week thereafter.  Under both the FLSA and NYLL, however, there is a presumption that such a weekly salary covers only the first

forty hours, unless the parties 'intend and understand the weekly salary to include overtime hours *at the premium rate.*'") (emphasis in original), *adopted*, 2014 WL 4105948 (S.D.N.Y. 2014); *Perez v. Platinum Plaza 400 Cleaners, Inc.*, 2015 WL 1881080, at *2 (S.D.N.Y. 2015) ("Defendants have not even come close to rebutting the presumption [that the weekly salary only covers the first 40 hours].").

233.   The presumption that Plaintiffs' weekly pay only covers the first 40 hours of work is reinforced by Defendants' numerous written representations on earnings statements and in letters that Plaintiffs weekly pay was based on 40-hours of work.

234.   Since Plaintiffs' weekly pay only covered the first 40 hours of work, their weekly pay did not change when Plaintiffs went from a six-day work week to a five-day work week.  Nor did it change when Plaintiffs worked past the end of their shift, as often happened, or when Plaintiffs worked up to 70 hours a week during the holiday season.

**Defendants' wage and hour violations were willful**

235.   The wage and hour violations referenced herein were willful in nature.

236.   The willfulness of the wage and hour violations referenced herein can be inferred from several sources, including, but not limited to, the Company's decision to give Plaintiffs misleading "manager" titles without bona fide manager

duties; the Company's practice of instructing Plaintiffs to only "clock" their attendance once a day rather than twice a day; the Company's disregard of other workplace protection laws (e.g., telling Seema Sharma she would be fired if she did not return to work within about three weeks after an on-the-job injury, even though her doctor advised against such an early return); the Company's practice of putting Plaintiffs in unsanitary work locations; and the Company's unlawful discrimination and retaliation, as referenced herein.

237.   Plaintiffs will prepare a detailed estimate of the unpaid overtime and liquidated damages owed under the FLSA and NYLL after receiving and analyzing available pay and attendance records, some of which are in Plaintiffs' possession, but all of which are in Defendants' possession.

### Sixth cause of action

### Unpaid overtime in violation of the New York law

238.   The Complaint's preceding allegations are incorporated by reference.

239.   Defendants are liable for unpaid overtime, liquidated damages, and prejudgment interest under NYLL § 663 and 12 N.Y. Comp.Codes R. & Regs. 142.

240.   Cumulative liquidated damages are still properly awarded under the NYLL and FLSA.  *See*, *e.g.*, *Rana v. Islam*, -- F.3d --, 2016 WL 5390941, at *4 (S.D.N.Y. September 26, 2016); *Rodriguez v. Globe Institute of Technology*, 2016 WL 5795127, at *4 (S.D.N.Y. Aug. 10, 2016), *adopted*, 2016 WL 5818573 (S.D.N.Y. Oct. 4, 2016); *Franco v. Jubilee First Avenue Corp.*, 2016 WL 4487788, at *17 (S.D.N.Y. Aug. 25, 2016); *Juan Escobar v. Del Monaco Brothers Industries Inc.*, 2016 WL 4275705, at *1 (E.D.N.Y. Aug. 13, 2016); *Vilchis v. Seoul Sisters, Inc.*, 2016 WL 6102342, at *1 (E.D.N.Y. Oct. 18, 2016).

241.   Although a number of courts now hold that cumulative liquidated damages under the FLSA and NYLL are unwarranted because the Legislature made it easier to receive liquidated damages under the NYLL and increased the NYLL's liquidated damages from 25% to 100%, *see*, *e.g.*, *Koszkos v. Janton Industries, Inc.*, 2016 WL 4444329, at *6 (E.D.N.Y. 2016), that view is unsound because the NYLL amendments were designed to *increase* both employer deterrence and the size of recoveries, neither of which would occur without cumulative liquidated damages.

242.   When the Legislature amends a statute, it is "presumed to be familiar with existing decisional law." *People v. Wood*, 58 A.D.3d 242, 248, 869 N.Y.S.2d 401, 406 (1st Dep't 2008).  The existing decisional law at the time the 2009 and 2011 NYLL amendments were enacted showed that awarding cumulative

liquidated damages under the FLSA and NYLL was the majority view.  *See*, *e.g.*,

*Jin M. Cao v. Wu Liang Ye Lexington Restaurant, Inc.*, 2010 WL 4159391, at *5

(S.D.N.Y. 2010) (Chin, J., Circuit Judge sitting by designation), citing *Yu G. Ke v.*

*Saigon Grill, Inc.*, 595 F.Supp.2d 240, 260–61 (S.D.N.Y. 2008); *Moon v. Kwon*,

248 F.Supp.2d 201, 235 (S.D.N.Y. 2002) (Lynch, J.) (awarding liquidated damages

and prejudgment interest for violations of FLSA and New York Labor Law); *Dong*

*v. CCW Fashion Inc.*, 2009 WL 884680, at *4 (S.D.N.Y. 2009); *Vasquez v. Ranieri*

*Cheese Corp.*, 2010 WL 1223606, at *18 (E.D.N.Y. 2010); *Callier v. Superior*

*Bldg. Services, Inc.*, 2010 WL 5625906, at *4 (E.D.N.Y. 2010); *Blue v. Finest*

*Guard Services, Inc.*, 2010 WL 2927398, at *11 (E.D.N.Y. 2010) (awarding FLSA

and NYLL liquidated damages); *Padilla v. Manlapaz*, 643 F.Supp.2d 302, 313

(E.D.N.Y. 2009) (same).

243.   Accordingly, since "virtually every enterprise in the nation doing the

requisite dollar volume of business is covered by the FLSA,*" Archie v. Grand*

*Cent. Partnership, Inc.*, 997 F.Supp. 504, 530 (S.D.N.Y. 1998) (Sotomayor, J.), a

blanket refusal to award NYLL liquidated damages when FLSA liquidated

damages are awarded would cause most employees to receive *smaller* liquidated

damages awards (100% of the unpaid wages) than they could have continued

receiving (125% of unpaid wages:  100% under the FLSA, and 25% under the

NYLL) if the Legislature had not amended the NYLL to *increase* both employer

deterrence and the size of recoveries.  The Legislature could not have intended such an anomalous result.

244.   To the extent courts are unwilling to allow cumulative liquidated damages because of a view that 100% liquidated damages for a 2-3 year period is adequate to deter employers from violating the wage and hour laws and to compensate unpaid plaintiffs, that view is also misplaced because it does not account for:  **(A)** the large number of wage and hour violations that are only partially remedied in a successful lawsuit (e.g., where the plaintiff works 10+ or 20+ years for the employer without being paid a legal wage, but can only recover for a small part of that period), or **(B)** the vast number of wage and hour violations that are never remedied in any way.  A similar point was made by Judge Posner in the context of tort law in *Lancaster v. Norfolk and Western Ry. Co.*, 773 F.2d 807, 822 (7th Cir. 1985) (Posner, J.):

> If a tortfeasor never had to pay more than the average victim's damages, <u>victims as a class would be systematically undercompensated and tortfeasors as a class therefore systematically underdeterred</u>, because victims with above-average injuries would get their damages cut down while victims with below-average injuries would not get an offsetting increase.

773 F.2d at 822 (emphasis added).

245.   Accordingly, cumulative liquidated damages should be awarded under the NYLL and FLSA.

## BCL § 630 Demand

Pursuant to New York Business Corporation Law ("BCL") § 630, Plaintiff hereby demands that Defendants permit an examination of their record of shareholders under BCL § 624 so that liability may be imposed on their respective top ten shareholders for the unpaid wages, etc. referenced herein.

## Jury Trial Demand

Plaintiffs demand a trial by jury with respect to all issues so triable, except for the process of computing the extent of Defendants' liability for unpaid overtime and overtime-related liquidated damages based on the jury's findings of fact with respect to the amount of overtime Plaintiffs worked, Plaintiffs' regular rates of pay, and any of the jury's other relevant findings of fact.

**WHEREFORE**, Plaintiffs respectfully request judgment in their favor in an amount to be determined at trials, together with attorney's fees, costs, disbursements and prejudgment interest (to the extent applicable), and such other and further relief as may be appropriate.

Dated:     New York, New York
           November 22, 2016     Law Offices of Scott A. Lucas

                         By:    */S/ Scott A. Lucas*
                               Scott A. Lucas (SL-6316)
                               250 Park Avenue, Suite 2020
                               New York, New York 10177
                               (212) 983-6000
                               *Attorneys for Plaintiffs*